_____
)
ADELPHIA AGIOS DEMETRIOS, LLC,  )
     Plaintiff                )
                              )
v.                            )     Civil Action No. 1:12-CV-10486
                              )
ARISTA DEVELOPMENT, LLC    )
     and                   )
GREGORY BOTSIVALES       )
     and                   )
HARRY BOTSIVALES         )
     and                   )
SCOTT WEYMOUTH         )
     Defendants           )
_____)

### *FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL*

Plaintiff, as and for its Complaint herein against Defendants, through its undersigned attorneys, allege:

### *PARTIES*

1.     The Plaintiff Adelphia Agios Demetrios, LLC (hereinafter "Adelphia"), is a New Hampshire limited liability company dealing in real estate development with its principal office located at 39 Freetown Road, Raymond, Rockingham County, State of New Hampshire 03077.

2.     The Defendant Arista Development, LLC (hereinafter "Arista"), is a Massachusetts limited liability company dealing in real estate development with its principal office located at 450 Station Avenue, South Yarmouth, Barnstable County, Massachusetts 02664.

3.     The Defendant Gregory Botsivales, is a person with a residence at 76 Bray Farm Road North, Yarmouth Port, Barnstable County, Massachusetts 02675.

4.     The Defendant Harry Botsivales is a person with a residence at 76 Bray Farm Road North, Yarmouth Port, Barnstable County, Massachusetts 02675.

5.     The Defendant Scott Weymouth (hereinafter "Weymouth"), is a person with a residence at 161 Quail Creek Road, North Attleboro, Bristol County, Massachusetts 02760.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the sum of $75,000.00, exclusive of costs and interest, and the Plaintiff is a citizen of a different state than all Defendants.

7.     The Court has personal jurisdiction over Defendant Arista because it maintains its principal place of business in the Commonwealth of Massachusetts.  The Court has personal jurisdiction over Defendants Gregory Botsivales, Harry Botsivales, and Scott Weymouth because the Defendants reside in the Commonwealth of Massachusetts.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(a), in that this action is brought in the judicial district where Defendant Arista maintains its principal place of business and Defendants Gregory Botsivales, Harry Botsivales, and Scott Weymouth reside.

## NATURE OF THE ACTION

9.     This is a claim for fraud under Massachusetts common law, breach of contract under Massachusetts common law, and consumer protection violations under Massachusetts General Laws, Chapter 93-A.

## *FACTS COMMON TO ALL CLAIMS*

### Plaintiff and Defendants' Relationship Prior to Cause of Action

10. Defendant Arista is a limited liability company, registered in Massachusetts. Defendant Gregory Botsivales is the registered manager of Arista. Defendants Gregory Botsivales, Harry Botsivales and Scott Weymouth are and were at all times set forth herein, agents, employees, and members of Arista. Defendants Gregory Botsivales, Harry Botsivales and Scott Weymouth also acted, at times stated herein, in their individual capacities. At all times set forth herein, all Defendants were actively engaged in the conduct of trade and/or commerce of commercial real estate.

11. At all times set forth herein, the Plaintiff Adelphia acted through its Manger, John Grammas, residing at 39 Freetown Road, Raymond, Rockingham County, New Hampshire 03077.

12. The Plaintiff met Defendant Weymouth in August, 2004. Plaintiff and Defendant Weymouth first met to negotiate the sale of Plaintiff's property in Epping, New Hampshire, which was approved as a site for development and construction of a Walgreens Drug Store. Defendant Weymouth acted in his personal capacity and in his capacity as an agent of Arista. Plaintiff and Defendants did not reach a deal and Plaintiff did not sell the Epping property to the Defendants.

13. On or about September 24, 2004, Plaintiff and Defendant Arista entered into a contract ("2004 Contract"); Defendant Gregory Botsivales signed as the "Manager" and representative of Arista. The 2004 Contract was to govern a business relationship whereby Plaintiff would locate commercial properties suitable for development, offer the properties to Defendant Arista, who would then develop the sites for use as Walgreens Pharmacies or for other uses.

14.     Under the 2004 Contract, Plaintiff provided Defendant Arista with eight sites for development, known by the parties as: 1) Plaistow Road, Plaistow, NH; 2) Route 111/Route 121A, East Hampstead, NH; 3) East Derry Road/South Main Street, Derry, NH; 4) Londonderry Turnpike/Wellington Road, Manchester, NH; 5) Derry Road/Abbott Farm Road, Hudson, NH; 6) Route 202/South Fruit Street & Loudon Road/Gate Street, Concord, NH; 7) Laconia Road/Sanborn Road, Tilton, NH; and 8) Main Street/Rowe Court, Laconia, NH.  The Defendant accepted but failed to develop any of the sites.  Plaintiff, by and through Plaintiff's counsel, Attorney Scott W. Lapointe, cancelled the 2004 Contract by a letter dated December 15, 2004.

**Discussions Between Plaintiff and Defendants Before Signing 2006 Contract**

15.     After terminating the 2004 Contract, Plaintiff and Defendants began negotiating a new contract.  In or about March, 2006, during an in-person conversation between Plaintiff and Defendant Scott Weymouth, Weymouth stated that he was going to attend a convention in New York City, where Weymouth intended to meet with Walgreens Company's New England Real Estate Representative (hereinafter "Representative").  Weymouth indicated that Defendant Gregory Botsivales planned to hire a call girl for the Walgreens New England Real Estate Representative (hereinafter "Representative"), so as to encourage the Representative to favor Defendant Arista Development, LLC when selecting properties for development.  Weymouth stated that the Walgreens Representative "was going to have marital problems."  Later that week, in March, 2006, while Plaintiff was in New Hampshire, Defendant Weymouth called Plaintiff and told Plaintiff that, after the night of the call girl's visit,  members of Arista met with the Walgreens Representative and Arista "was now number one to do real estate" for Walgreens.

**Negotiations Leading to Signing the 2006 Contract**

16.     On or about March 16, 2006, Defendants invited Plaintiff to travel from New Hampshire to Burlington, Massachusetts, to discuss signing a new contract.  Plaintiff and the Defendants met at the Legal Seafoods Restaurant in Burlington, Massachusetts

17.      During the negotiations, Plaintiff told Defendants Gregory and Harry Botsivales that Plaintiff would only sign the 2006 Contract if the Defendants promised to hire two civil engineers to work on ten property development sites per year.  The Defendants promised that the civil engineers would work directly with the Plaintiff in New Hampshire.  That condition was a critical and material requisite term for Plaintiff to sign a new contract with the Defendants.  Defendants Gregory and Harry Botsivales, acting in their official capacities as agents of Defendant Arista, promised to hire the two engineers as Plaintiff demanded.  Two hours after the lunch, Defendant Weymouth, acting in his capacity as an agent of Arista, called Plaintiff and told Plaintiff that Arista had promised to hire the two engineers, as promised.  As detailed below, the Defendants never hired the engineers as they has promised.

**Terms of the 2006 Contract**

18.     On or about March 16, 2006, Plaintiff and Defendant Arista entered into a contract ("2006 Contract"), signed by John Grammas, Manager of Plaintiff Adelphia Agios Demetrios, LLC and Gregory Botsivales, Manager of Arista Development, LLC.  The Contract was signed in Burlington, Massachusetts.

19.     The 2006 Contract's purpose was to govern a business relationship ("the Joint Venture") whereby Plaintiff would locate commercial properties suitable for development and offer the properties to the Defendant, who would then develop the sites for use as Walgreens Pharmacies

or for other similar uses. The Parties intended for the Joint Venture to lease the property to Walgreens during the construction phase; the lease would terminate when the Joint Venture sold the property to investors and/or Walgreens.

20. The 2006 Contract granted Plaintiff "full access to the books and records, correspondence and other documents of the [Defendant] in connection with each site offered by [the Plaintiff] and determined viable by [the Defendant]." (alterations added).

21. The 2006 Contract provided that "The Developer, along with the Partner, will arrange for any such potential development site to be put under agreement, subject to usual contingencies, and submit the potential site to Walgreens (or other potential designated retail tenants) for approval, negotiate the lease with Walgreens, and arrange financing and construct the project."

22. The 2006 Contract conferred upon both parties the right to terminate the contract upon sixty (60) days written notice to the other party. The 2006 Contract specifically dictated that "such termination shall not terminate each respective party's interest in any project or potential project offered by Partner to Developer."

23. For each property that Plaintiff located and the Defendant accepted, the 2006 Contract entitled the Plaintiff to a Fifty Thousand and 00/100s Dollar ($50,000.00) market development overhead fee.

24. The 2006 Contract provided for creation of a single purpose entity to hold each joint venture property. For each Walgreens-related project, the 2006 Contract gave Plaintiff a Twenty-Five Percent (25%) interest in the single purpose entity. For projects not related to Walgreens, the ownership percentage was to be agreed-upon by the parties.

25. The 2006 Contract provides that the terms of the contract are enforceable against the parties.

26. On or about October 6, 2006, Plaintiff, by and through counsel, terminated the 2006 Contract with the Defendant. The contract specifically provided that "termination shall not terminate each respective party's interest in any project or potential project offered by [Plaintiff] to [Arista]." Also on or about October 6, 2006, in a separate letter, Plaintiff, through its attorney, expressly reserved Plaintiff's continued interest in the joint venture's ongoing and potential projects. By the terms of the Contract, Plaintiff had a Twenty-Five Percent (25%) interest in each ongoing and future project in which the parties jointly worked to develop.

### Sales Profits Earned by the Joint Venture Under the 2006 Contract

27. Plaintiff and Defendant Arista Development, LLC worked jointly to develop multiple properties into Walgreens Pharmacies. The properties encompassed by the 2006 Contract that were developed into Walgreens Pharmacies include, but are not limited to: A) 45 Court Street, Laconia, NH, acquired by the Joint Venture on April 4, 2009; B) Milford, NH, acquired by the Joint Venture on April 10, 2007; C) 90 Derry Street, Hudson, NH, acquired by the Joint Venture on June 5, 2008; D) 151 Bridge Street, Pelham, NH, acquired by the Joint Venture on June 30, 2010; E) 288 Sandown Road, Hampstead, NH, acquired by the Joint Venture on September 5, 2006; F) 53 Epping Road, Raymond, NH, acquired by the Joint Venture on November 16, 2007; G) 91 Calef Highway, Lee, NH, acquired by the Joint Venture on December 23, 2008; H) 868 Main Street, Sanford, ME, acquired by the Joint Venture on May 31, 2011; I) Littleton, NH, acquired by the Joint Venture on March 8, 2006; and J) 4 Sanborn Road, Tilton, NH, acquired by the Joint Venture on June 22, 2007.

28.     For each property, the Joint Venture's practice and procedure was to acquire the property; hold the property in a specially-formed, single-purpose entity; gain approval from Walgreens to construct a Walgreens Drug Store on the property; execute a lease whereby Walgreens would pay rent to the specially formed LLC holding the property; use the strength of the lease as collateral to obtain construction loans; construct the Walgreens Drug Store building; then sell the property to investors and/or Walgreens for a profit.

29.     For any given property, the reasonable cost to construct a Walgreens store averages approximately $2,500,000.00, including soft costs related to the construction. Soft costs are defined as costs incurred for surveying, engineering, architectural work, legal expenses, commissions, traffic studies, geological-technical investigation, environmental analysis, and debt financing. For each property, Walgreens Drug Store typically requested additions to the construction, which averaged approximately $125,000.00 per store.

30.     The Joint Venture sold the properties it developed into Walgreens Pharmacies. The Joint Venture profited from all Walgreens Properties it has sold. Plaintiff estimates the Joint Venture made a total profit of $23,056,833.00 from its sales of properties to Walgreens. Plaintiff formulated its estimate by subtracting the site acquisition fees and the estimated $2,500,000.00 in reasonable construction costs (defined supra, ¶ 29) from each property's sales price; the site acquisition fees and sales prices were determined by title searches with the Registry of Deeds in the county in which each property is located. Plaintiff estimates the total sales profits received by the Joint Venture to be $23,056,832.00; Plaintiff estimates the 25% interest in the Joint Venture's profits to be $5,764,208.00. Plaintiff estimates the Joint Venture's profits for each individual property development project as follows:

a. 45 Court Street, Laconia, NH ("Laconia"). The Joint Venture sold the property for $7,460,000.00. Subtracting the property purchase cost ($2,167,133.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $2,792,867.00.

b. Milford, NH ("Milford"). The Joint Venture sold the property for $5,623,933.00. Subtracting the property purchase cost ($328,600.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $2,795,333.00.

c. 90 Derry Street, Hudson, NH ("Hudson"). The Joint Venture sold the property for $5,355,000.00. Subtracting the property purchase cost ($1,990,000.00) and the estimated reasonable construction costs of $2,200,000.00 (Plaintiff estimates the construction costs of this building to be $2,200,000.00), Plaintiff estimates the Joint Venture's profit to be $1,165,000.00.

d. 151 Bridge Street, Pelham, NH ("Pelham"). The Joint Venture sold the property for $6,900,000.00. Subtracting the property purchase cost ($2,010,000.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $2,390,000.00.

e. 288 Sandown Road, Hampstead, NH ("Hampstead"). The Joint Venture sold the property for $7,081,000.00. Subtracting the property purchase cost ($1,800,000.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $2,781,000.00.

f.      53 Epping Road, Raymond, NH ("Raymond").  The Joint Venture sold the property for $6,090,000.00.  Subtracting the property purchase cost ($251,000.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $3,339,000.00.

g.      91 Calef Highway, Lee, NH ("Lee").  The Joint Venture sold the property for $5,170,000.00.  Subtracting the property purchase cost ($1,440,000.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $1,230,000.00.

h.      Littleton, NH ("Littleton").   The Joint Venture sold the property for $5,737,533.00.  Subtracting the property purchase cost ($1,530,000.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $1,707,533.00.

i.      4 Sanborn Road, Tilton, NH ("Tilton").  The Joint Venture sold the property for $7,960,000.00.  Subtracting the property purchase cost ($2,750,000.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $2,710,000.00.

j.      Sanford, ME ("Sanford").  The Joint Venture sold the property for approximately $7,750,000.00.  Subtracting the property purchase cost ($3,103,900.00) and the estimated reasonable construction costs of $2,500,000.00, Plaintiff estimates the Joint Venture's profit to be $2,146,100.00.

31.      Pursuant to the surviving terms of the 2006 Contract, Plaintiff is entitled to 25% of the profits from each transaction in which the Joint Venture developed property and sold it to

Walgreens. Plaintiff estimates it is owed $5,764,208.00 in sales profits under the surviving terms of the contract.

32.     Plaintiff never received any payments representing its 25% interest in the Joint Venture's profits from selling properties to Walgreens, with eh exception of the Hampstead property, for which it received partial payment of approximately $338,300.00.


**Lease Profits Earned by the Joint Venture Under the 2006 Contract**

33.     In accordance with the Joint Venture's plans and procedures, the Joint Venture granted leases of several properties to Walgreens. Plaintiff reasonably estimates that the rents Walgreens paid the Joint Venture for each leased property averaged $40,000.00 per month, of which $25,000.00 per month covered interest and costs, which left a monthly rental profit of $15,000.00 per month per property. Plaintiff estimates the total income to the Joint Venture from rents totaled $900,000.00. Plaintiff estimates the rents from each Walgreens property subject to the lease to Walgreens to be:

   a.     Laconia.     The Joint Venture leased the property to Walgreens for approximately three months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $45,000.00.

   b.     Hudson.     The Joint Venture leased the property to Walgreens for approximately eleven months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $165,000.00.

c. Pelham. The Joint Venture leased the property to Walgreens for approximately five months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $75,000.00.

d. Hampstead. The Joint Venture leased the property to Walgreens for approximately four months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $60,000.00.

e. Raymond. The Joint Venture leased the property to Walgreens for approximately eleven months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $165,000.00.

f. Lee. The Joint Venture leased the property to Walgreens for approximately nine months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $135,000.00.

g. Littleton. The Joint Venture leased the property to Walgreens for approximately two and one-half months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $37,500.00.

h. Tilton. The Joint Venture leased the property to Walgreens for approximately ten and one-half months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $157,500.00.

i. Milford. The Joint Venture leased the property to Walgreens for approximately four months. Using the estimated average monthly rental profit of $15,000.00, Plaintiff estimates the Joint Venture's profit from rents to be $60,000.00.

34.     Pursuant to the surviving terms of the 2006 Contract, the Plaintiff is entitled to 25% of the profits from each transaction in which the Joint Venture leased property to Walgreens. Plaintiff estimates it is owed $225,000.00 in lease profits under the surviving terms of the contract.

35.     Plaintiff never received payment of its 25% interest in the Joint Venture's profits from rents received from Walgreens.

**Plaintiff's Market Development Overhead Fee Under 2006 Contract**

36.     Pursuant to the 2006 Contract and its surviving terms, Plaintiff provided multiple proposed properties that Defendant Arista accepted for development.  For each accepted property, the 2006 Contract entitled Plaintiff to a Fifty Thousand and 00/100s Dollar ($50,000.00) market development overhead fee.

37.     Of all the properties Plaintiff referred and Defendant Arista accepted, the Defendant only paid Plaintiff its market development overhead fee on two occasions:

        a.      On or about the Fall of 2008, Defendant Arista paid Plaintiff its $50,000.00 market development overhead fee for the Hudson property;

        b.      On or about September 5, 2006, Defendant Arista paid Plaintiff its $50,000.00 market development overhead fee for the Hampstead property.

38.     The Defendant failed to pay Plaintiff its market development overhead fee for the following properties that were accepted and developed for use as Walgreens Pharmacies: A) Laconia, NH; B) Milford, NH; C) Pelham, NH; D) Raymond, NH; E) Lee, NH; F) Sanford, ME; G) Littleton, NH; and H) Tilton, NH.  Plaintiff reasonably estimates that the Defendant owes it market development overhead fees totaling $400,000.00.

**Properties Defendant Arista Failed to Develop Under the 2006 Contract**

39.     In addition to the foregoing, Plaintiff, under the 2006 Contract and its surviving terms, presented several properties to the Defendant, but the Defendant failed to develop them.

40.     Of the properties the Defendant failed to develop under the 2006 Contract and its surviving terms, one property was developed into a CVS Pharmacy.  That property was located in Derry, New Hampshire.

41.     Of the properties the Defendant failed to develop under the 2006 Contract and its surviving terms, two properties were developed into Rite-Aid Pharmacies.  Those properties are as follows: A) Plaistow, NH-2; and B) Rochester, NH.

42.     Of the properties the Defendant failed to develop under the 2006 Contract and its surviving terms, Plaintiff estimates eighteen properties remain undeveloped.  Either as the result of discovery or evidence adduced at trial, additional evidence may be discovered and/or proved that may prove additional damages in favor of the Plaintiff.

43.     Had the Defendant Arista complied with its obligation to develop the above-listed properties, Plaintiff would have received market development overhead fees and 25% of the Joint Venture's profits from leases and sales.  For each property that went undeveloped under the 2006 Contract, Plaintiff estimates the amounts to which it is entitled under the 2006 Contract and its surviving terms to be:

    a.     $50,000.00 market development overhead fee for each of the sixteen above-listed properties;

b.      25% of the sales profits of each single-purpose entity owned by the Joint Venture.  Plaintiff reasonably estimates the reasonable profits from each project to be $2,591,000.00.  Plaintiff's estimate of reasonable profits from each project approximately equals the  average profits calculated for the properties actually developed pursuant to the 2006 Contract and its surviving terms.  Therefore, Plaintiff is entitled to its 25% share of such profits.  Either as the result of discovery or evidence adduced at trial, additional evidence may be discovered and/or proved that may prove additional damages in favor of the Plaintiff.

c.      25% of the rent profits of each single-purpose entity owned by the Joint Venture. Plaintiff reasonably estimates the reasonable rental profits from each project to be $75,000.00.  Plaintiff's estimate of reasonable lease profits from each project approximately equals the average number of months the Joint Venture leased the properties developed pursuant to the 2006 Contract and its surviving terms, multiplied by the estimated $15,000.00 per month estimate of reasonable rental profits.  Therefore, Plaintiff is entitled to its 25% share of rental profits.  Either as the result of discovery or evidence adduced at trial, additional evidence may be discovered and/or proved that may prove additional damages in favor of the Plaintiff.

### COUNT I
### FRAUD
### ALLEGED AGAINST ALL DEFENDANTS

44.      Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 43 as if fully stated herein.

45.      The Defendants made several false misrepresentations of material fact, including, but not limited to, the following:

a. On March 16, 2006, the date the parties signed the 2006 Contract, Defendants Gregory Botsivales, Harry Botsivales, and Scott Weymouth, acting in their official capacities as agents of Defendant Arista, as well as in their individual capacities, promised Plaintiff that, in partial consideration for Plaintiff's signing the 2006 Contract, Defendant Arista would hire two civil engineers to work for the Joint Venture on ten sites per year.

b. On March 16, 2006, two hours after signing the contract, Defendant Weymouth, acting in his official capacity as an agent of Defendant Arista, called Plaintiff and again promised that Defendant Arista would hire two civil engineers to work for the Joint Venture on ten sites per year.

c. On March 16, 2006, the date the parties signed the 2006 Contract, Defendants Gregory Botsivales, Harry Botsivales, and Scott Weymouth, acting in their official capacities as agents of Defendant Arista, as well as in their individual capacities, promised Plaintiff that, in partial consideration for Plaintiff's signing the 2006 Contract, Defendant Arista would work with Plaintiff to develop ten sites per year.

46. Plaintiff reasonably believes and therefore alleges that the Defendants manipulated the financing records of both the Joint Venture's single-purpose entities and Defendant Arista so as to defraud Plaintiff from its rightful share of the Joint Venture's profits. Plaintiff reasonably believes and therefore alleges that the Defendants artificially inflated the reported property development and construction costs, thereby deflating the Joint Venture's reported profits. The Defendants acted fraudulently with the intent to injure Plaintiff. While Plaintiff anticipates obtaining additional evidence during discovery to prove additional claims of fraud, Plaintiff states as follows in support of the claims contained in this paragraph:

a.      For its participation in the development of the Hampstead property, the Defendant paid Plaintiff payments totaling $338,000.00.  The payments were purportedly to pay Plaintiff its $50,000.00 real estate development overhead fee and compensate Plaintiff for its 25% interest in the Joint Venture's profits, which included the sales price received from Walgreens and change order costs.

b.      Plaintiff reasonably relied on the Defendants's representations because the parties were in a confidential relationship.

c.      Plaintiff acted upon the information and accepted the funds paid as full compensation for the Plaintiff's real estate development overhead fee and for its 25% interest in the Joint Venture's profits.

d.      Plaintiff now reasonably believes the actual profits the Joint Venture received from the Hampstead project were an estimate of $60,000.00 in rental profits and $2,781,000.00 in sales profits, totaling $2,841,000.00.  Plaintiff estimates its 25% share of the total profits from the Hampstead property to be approximately $710,000.00.

e.      Plaintiff believes the Defendants engaged in similar conduct, resulting in similar damages to Plaintiff.

47.      Plaintiff therefore relied on the Defendants' statements and payments to its pecuniary detriment.

### COUNT II
### BREACH OF CONTRACT
### ALLEGED AGAINST ALL DEFENDANTS

48.      Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 47 as if fully stated herein.

### A. Market Development Overhead Fee Due to Plaintiff:

49.     The 2006 Contract and its surviving terms provide that Plaintiff is entitled to a $50,000.00 market development overhead fee for each property accepted by Defendant Arista for development by the Joint Venture.  The fee was to be paid from "financing proceeds or cash flow, whichever will result in the earlier payment to Partner."

50.     The Defendant Arista failed to pay Plaintiff its $50,000.00 "market development overhead fee" for the following Walgreens projects developed by the Joint Venture: Laconia, Milford, Pelham,  Raymond, Lee, Sanford, Littleton, and Tilton.

51.     Since the Joint Venture received financing proceeds and/or cash from sales for each property, yet the Defendant failed to pay Plaintiff its 25% share of such proceeds, the Defendant Arista has therefore breached its obligation under the 2006 Contract to pay Plaintiff its market development overhead fee for eight properties.

52.     Plaintiff estimates the damages from this breach of failing to pay Plaintiff its market development overhead fee, exclusive of interest and costs, total approximately $400,000.00.

### B. 25% Interest in Joint Venture's Property Due to Plaintiff:

53.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 52 as if fully stated herein.

54.     The 2006 Contract and its surviving terms provide that Plaintiff possesses a 25% interest in each "single purpose entity" holding property for development and sale to Walgreens.

55.     The Defendant Arista failed to pay Plaintiff its 25% share of the profits from the Joint Venture's lease of some properties to Walgreens and the sale of properties to Walgreens.

56.     Plaintiff estimates the Joint Venture's single-purpose entities were funded with the following rents and sale proceeds:

  a.     The Joint Venture's single-purpose entities received rents from Walgreens for leases of eight properties, including: Laconia, Hudson, Pelham, Hampstead, Raymond, Lee, Littleton, Tilton, and Milford.   Plaintiff estimates   Defendant Arista owes Plaintiff approximately $225,000.00 in rental profits received, which represents Plaintiff's 25% interest in the Joint Venture's rental profits received;

  b.     The Joint Venture's single-purpose entities received cash from sales of properties to Walgreens, including: Laconia, Milford, Hudson, Pelham, Hampstead, Raymond, Lee, Sanford, Littleton, and Tilton.   Plaintiff estimates Defendant Arista owes Plaintiff $5,764,208.00, which represents Plaintiff's 25% interest in the Joint Venture's sales profits.

57.     Since the Joint Venture's single purpose entities received cash from leases and sales of property, the Defendant Arista has therefore breached its obligation under the 2006 Contract and its surviving terms to pay Plaintiff its share of the Joint Venture's single-purpose entities' assets. Plaintiff estimates the Defendant Arista owes it approximately $5,989,208.00, exclusive of interest and costs, in lease and sale proceeds.

### C.  Defendants' Failure to Provide Plaintiff With Monthly Updates:

58.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 57 as if fully stated herein.

59.     The 2006 Contract and its surviving terms provide that the Defendant Arista "shall provide [Plaintiff] with monthly updates on status of development of listed sites."

60.     Since the termination of the 2006 Contract, and despite the surviving rights and obligations of the parties, the Defendant Arista failed to update Plaintiff on the status of development efforts of projects covered by the 2006 Contract.

61.     The Defendant, in breaching its duty to update Plaintiff on the status of development efforts, rendered Plaintiff unable to track, verify, or otherwise assess its interests in the subject properties.

62.     Plaintiff claims damages for the aforementioned breach.

### D.  Defendants' Failure to Provide Plaintiff With Access to Arista's Books, Records, Correspondence, and Other Documents:

63.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 62 as if fully stated herein.

64.     The 2006 Contract and its surviving terms provide that Plaintiff "will have full access to the books and records, correspondence and other documents of [Defendant Arista] in connection with each site offered by [Plaintiff] and determined viable by [Defendant Arista]."

65.     The Defendants breached the 2006 Contract and the surviving contractual terms by denying Plaintiff access to its books, records, correspondence, and other documents related to the each development site owned by the Joint Venture.

66.     The Defendant, in breaching its duty to update the Plaintiff on the status of development efforts, has rendered the Plaintiff unable to track, verify, or otherwise assess its interests in the subject properties.

67.     Plaintiff claims damages for the aforementioned breach.

**E. Defendants' Failure to Hire Two Civil Engineers**

68.     Plaintiff repeats and realleges paragraphs 1 through 67 of this Complaint and incorporate the same herein by reference.

69.     On March 16, 2006, the date the parties signed the 2006 Contract, Defendants Gregory Botsivales, Harry Botsivales, and Scott Weymouth, acting in their official capacities as agents of Defendant Arista, as well as in their individual capacities, promised the Plaintiff that, in partial consideration for Plaintiff signing the 2006 Contract, Defendant Arista would hire two civil engineers to work for the Joint Venture on ten sites per year.

70.     Two hours after signing the contract, Defendant Weymouth, acting in his official capacity as an agent of Defendant Arista, called Plaintiff and again promised that Defendant Arista would hire two civil engineers to work for the Joint Venture on ten sites per year.

71.     To date, the Defendants have failed to hire any civil engineers to work for the Joint Venture, thereby breaching their enforceable oral contract made on March 16, 2006.

72.     Plaintiff claims damages for the aforementioned breach.

**F. Defendants' Failure to Work with Plaintiff to Develop Ten Sites Per Year**

73.     Plaintiff repeats and realleges paragraphs 1 through 72 of this Complaint and incorporates the same herein by reference.

74.     On March 16, 2006, the date the parties signed the 2006 Contract, Defendants Gregory Botsivales, Harry Botsivales, and Scott Weymouth, acting in their official capacities as agents of Defendant Arista, as well as in their individual capacities, promised Plaintiff that, in partial consideration for Plaintiff's signing the 2006 Contract, Defendant Arista would work with Plaintiff to develop ten sites per year.

75.     To date, the 2006 Contract and/or its surviving terms have been in effect for over five years.  The Defendant has only worked with Plaintiff to develop ten properties during that time.

76.     Plaintiff claims damages for the aforementioned breach.

### G.  Defendants' Failure to Develop Sites it Accepted
### Under 2006 Contract and Its Surviving Terms

77.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 76 as if fully stated herein.

78.     The Plaintiff, under the 2006 Contract and its surviving terms, provided the Defendants with several properties to develop, but the Defendant failed to develop them.

79.     As a result of the Defendant's breach of its promise to work to develop properties it accepted for development, the Plaintiff estimates that twenty-one properties went undeveloped. Either as the result of discovery or evidence adduced at trial, additional evidence may be discovered and/or proved that may prove additional damages in favor of the Plaintiff. Of the twenty-one properties of which the Plaintiff is aware, one property was developed by other parties into a CVS Pharmacy, two properties were developed by other parties into Rite-Aid Pharmacies, and the other properties remain undeveloped.

80.     Plaintiff estimates the reasonably foreseeable damages of this breach to include:

a.     Approximately $50,000.00 in market development overhead fees due to Plaintiff for each property;

b.     25% share of the sales profits;

c.     25% share of the profits from rental income.

81.     Since the Joint Venture's single purpose entities received cash from leases and sales of property, the Defendant Arista has therefore breached its obligation under the 2006 Contract and

its surviving terms to pay Plaintiff its share of the Joint Venture's single-purpose entities' assets. Either as the result of discovery or evidence adduced at trial, additional evidence may be discovered and/or proved that may prove additional damages in favor of the Plaintiff.

### COUNT III
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ALLEGED AGAINST ALL DEFENDANTS

82.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 81 as if fully stated herein.

83.     Massachusetts common law imposes an implied covenant of good faith and fair dealing on parties to any contract, regardless of whether the covenant is explicitly included in the contract. Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991) (quoting Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976)).

84.     The Defendant Arista acted to destroy or otherwise prohibit Plaintiff from receiving the fruits of the 2006 Contract and its surviving terms. Defendant Arista's acts constituting breach of the implied covenant of good faith and fair dealing include, but are not limited to:

     a.     Artificially inflating reported construction costs so as to indicate that the Joint Venture's single-purpose entities made a lower than actual profit;

     b.     Failing to provide Plaintiff with access to Defendant Arista's books, records, correspondence, and other documents related to each development site owned by the Joint Venture, thereby concealing any profits earned by the Joint Venture;

     c.     Failing, for eight properties, to pay Plaintiff its market development overhead fee of $50,000.00 per accepted property;

d.	Inducing Plaintiff to enter into the 2006 Contract by falsely promising to hire two civil engineers to work for the Joint Venture on ten properties per year;

e.	Inducing Plaintiff to enter into the 2006 Contract by falsely promising to work with Plaintiff to develop ten properties per year.

### COUNT III
### VIOLATION OF MASS. GEN. LAWS CH. 93-A, § 11
### ALLEGED AGAINST DEFENDANTS ARISTA AND GREGORY BOTSIVALES

85.	Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 84 as if fully stated herein.

86.	During the course of events described herein, and in their official and individual capacities, Defendants Arista and Gregory Botsivales engaged in both unfair or deceptive trade or practices and unfair methods of competition.

87.	During the commission of such acts, Defendants Arista and Gregory Botsivales were engaged in trade and commerce as defined by Mass. Gen. Laws ch. 93-A, § 3, in that they were engaged in the business of selling, renting, and/or leasing real property; additionally, they were engaged in the property development business whereby they provided property development services.

88.	Defendants Arista and Gregory Botsivales committed the described acts knowingly or willfully under Mass. Gen. Laws ch. 93A, § 1, which provides that, for knowingly or willfully committed violations, recovery shall equal: "up to three, but not less than two, times" actual damages, which "shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim."

## A.     Unfair or deceptive trade or practices

89.     Defendants Arista and Gregory Botsivales engaged in unfair or deceptive trade or practices by inducing Plaintiff to enter into the 2006 Contract, then actively breaching their duties under the contract.  Defendants Arista and Gregory Botsivales' breaches include, but are not limited to:

a.     Failing to pay Adelphia its market development overhead fee of $50,000.00 per property for eight properties;

b.     Failing to pay Arista its 25% share of each of the Joint Venture's single-purpose entities, which held the Joint Venture's rents and sales proceeds;

c.     Denying Adelphia "full access to the books and records, correspondence and other documents [belonging to Arista] in connection with each site offered by [Adelphia] and determined viable by [Arista]";

d.     Failing to arrange for sites to be put under agreement, failing to submit potential sites to Walgreens or other potential designated retail tenants, failing to negotiate leases with Walgreens, and failing to arrange financing and construct multiple projects;

e.     Promising Adelphia that Arista would hire two engineers to help develop ten sites per year to induce Adelphia to enter the 2006 Contract, then failing to hire said engineers;

f.     Promising Adelphia that Arista would work with Adelphia to develop ten sites per year to induce Adelphia to enter the 2006 Contract, then failing to work with Adelphia to develop ten sites per year;

g.     Artificially inflating reported costs of acquisition, construction and development, thereby artificially deflating reported profits from each site that was developed;

90.     The above-described actions, committed by Defendants Arista and Gregory Botsivales, constitute unfair and/or deceptive trade or practices in violation of Mass. Gen. Laws ch. 93-A.

**B.      Unfair methods of competition**

91.     Defendants Arista and Gregory Botsivales engaged in unfair methods of competition in the conduct of trade or commerce.

92.     On or about 2008, Gregory Botsivales, acting in his individual and official capacity as Manager and agent of Arista, told Plaintiff "Go fuck yourself, I will blackball you so that you're never going to do a Walgreens or CVS."

93.     Plaintiff, who, until that point, enjoyed strong business relationships with real estate representatives at Walgreens and CVS, was thereafter unable to successfully contact those representatives.

94.     Plaintiff reasonably believes that Arista acted to prohibit Plaintiff from competing in the commercial pharmacy real estate development market.

95.     Plaintiff reasonably estimates that, as a result of being "blackball[ed]," it lost the opportunity to develop twenty-one properties, with an estimated average profit from sales, rents, change orders, etc. of approximately $2,791,000.00 per property, to which Plaintiff would have been entitled to 25% under the 2006 Contract and its surviving terms.  Additionally, Plaintiff would have been entitled to its $50,000.00 market development overhead fee per property.  Either as the result of discovery or evidence adduced at trial, additional evidence may be discovered and/or proved that may prove additional damages in favor of the Plaintiff.

## *DAMAGES*

96.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 95 as if fully stated herein.

97.     Plaintiff's damages calculations set forth in this pleading are based on a reasonable balance of probabilities and are subject to Plaintiff's discovery in this case.

98.     Based on the foregoing facts, Defendants Arista Development, LLC, Gregory Botsivales, Harry Botsivales, and Scott Weymouth are liable to the Plaintiff for substantial and considerable damages within the jurisdictional limits of this Court.

**WHEREFORE,** the Plaintiff Adelphia Agios Demetrios, LLC prays that this Honorable Court:

A.     Grant the Plaintiff's Complaint;

B.     Issue judgment against the Defendants for Plaintiff's damages, including interest and attorney's fees and costs incurred; and

C.     Issue such other Orders as justice requires.

Respectfully submitted,

ADELPHIA AGIOS DEMETRIOS, LLC,

By its attorneys,
SHAINES & McEACHERN, PA

Date: July 3, 2012                    */s/ Robert A. Shaines*
                                      Robert A. Shaines, Esquire (BBO# 453100)
                                      282 Corporate Drive, #2
                                      P.O. Box 360
                                      Portsmouth, NH 03802-0360
                                      (603) 436-3110
                                      rshaines@shaines.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *First Amended Complaint and Demand for Jury Trial* filed through the ECF system will be mailed via First Class US Mail, postage prepaid, this 3rd day of July 2012 to Arista Development, LLC, Gregory Botsivales, Harry Botsivales and Scott Weymouth at 450 Station Avenue, South Yarmouth, MA 02664.

*/s/ Robert A. Shaines*